**OLSON RUG COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 12303.

United States Court of Appeals
Seventh Circuit.

May 25, 1961.

Frederick W. Turner, Jr., Chicago, Ill., for petitioner.

Thomas J. McDermott, Assoc. Gen. Counsel, Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, DUFFY and KNOCH, Circuit Judges.

HASTINGS, Chief Judge.

On petition of the National Labor Relations Board, this court on October 24, 1960 appointed a Special Master to determine issues of fact presented by the Board's charge that Olson Rug Company, Inc. be adjudicated in civil contempt of our decree of December 9, 1958. This decree was based upon our decision in Olson Rug Company v. National Labor Relations Board, 7 Cir., 1958, 260 F.2d 255, which held that Olson had committed certain unfair labor practices and granted enforcement of the Board's order.

In the course of the contempt hearing before the Special Master, Olson served two subpoenas *duces tecum* upon the Board for the production of certain documentary evidence contained in the Board's files. The Master denied the Board's motion to revoke such subpoenas but granted Olson only a limited "Jencks-type" discovery described, infra. Because of the lack of any direct precedent on this important question of forcing production from the Board's files of "confidential" documents, the Master certified his ruling to this court for interlocutory

review. Briefs were filed and argument was heard on the Board's motion to reverse in part the ruling of the Special Master.

To appraise fully the Master's rulings on the discovery subpoenas, we must retrace the history of this litigation, commencing with the decree of our court. On December 9, 1958, we ordered Olson to cease and desist from refusing to bargain collectively concerning rates of pay, wages, hours or other conditions of employment with Textile Workers Union of America, AFL–CIO (TWUA), the certified bargaining representative of certain Olson employees in its Chicago plant. We forbade Olson from interfering with the efforts of TWUA in negotiating or representing Olson's employees. Finally, we affirmatively ordered Olson to bargain with TWUA with respect to pay, wages, hours and other conditions of employment.

Bargaining commenced between Olson and TWUA on December 29, 1958; it continued until November 13, 1959. During this period, agreement was reached on certain issues.

While the negotiations were in progress, on July 21, 1959 TWUA filed an unfair labor practice charge against Olson. Administratively, this charge was processed under the title 13–CA–3355. The Board's investigatory file in this case is one of three files subject to Olson's subpoenas.

In this unfair practice charge, TWUA alleged that Olson was engaged in sham bargaining, had granted unilateral wage increases during the period of negotiation, had refused to recognize TWUA in processing grievances, and, through a foreman, had made threats of surveillance of union meetings.

For the next three months, the unfair practice charge, 13–CA–3355, was under investigation by the Board. On October 23, 1959, the Board notified the interested parties that the charge had been dismissed by the Board.

Subsequently, on November 13, 1959, Olson refused to continue bargaining with TWUA and withdrew recognition of that union. On the same day, Olson filed a representation petition with the Board. This petition was titled 13–RM–509, and the Board's investigatory file in this case is the second file subject to Olson's subpoenas.

On November 30, 1959, sixteen of Olson's employees filed a decertification petition with the Board. The administrative file of this case, 13–RD–407, is the third file within the scope of the subpoenas.

From November, 1959 until January 7, 1960, the Board received new and additional evidence relating to Olson's alleged unfair conduct in support of TWUA's charges in 13–CA–3355. On January 7, 1960 the Board revoked its earlier dismissal of the charges in 13–CA–3355 on the grounds of newly discovered evidence and Olson's withdrawal of recognition of TWUA.

On January 29, 1960, the regional director of the Board advised the general counsel to bring contempt charges against Olson. Such contempt charges were filed in our court on June 27, 1960 and led to the appointment of the Special Master who, as above stated, certified the instant question for interlocutory review.

On July 27, 1960 and August 17, 1960, respectively, the Board dismissed the representation petition, 13–RM–509, and the decertification petition, 13–RD–407, consistent with its administrative practice of dismissal of such petitions while unfair labor practice charges are pending.

The Board's contempt petition charged Olson with the following conduct contemptuous of our decree of December 9, 1958:

> (a) Olson instituted unilateral changes in its wage structure without consulting TWUA;
>
> (b) Olson employed undercover operatives to observe and report on union attitudes and the activities of its employees;

(c) Olson employed undercover operatives to learn and report TWUA's bargaining strategy;

(d) Olson withdrew recognition from TWUA and refused to bargain further in the absence of a good faith doubt of the union's majority status.

Our order of reference of December 5, 1960 to the Special Master granted him the power to "require the production before him of admissible evidence upon all matters relevant and material to the issues, including the production of all books, papers, voucher[s], documents and writings."

In the course of the hearings before the Master, on January 27 and February 9, 1961 Olson served the subpoenas *duces tecum* in question upon the Board to force production, inspection and discovery of Board files 13–CA–3355, 13–RD–407, and 13–RM–509.

The Board moved to revoke the subpoenas, citing its administrative rules and regulations suppressing documents in its files, contending that there was no showing that any documents in its possession were "relevant to any issue in the Company's defense," and arguing that Olson was seeking "unlimited discovery" of Board files.

The Master, in his certification of the instant question for interlocutory review, indicates the present procedural posture of the case before the Master. The Board has presented its case-in-chief, then over Olson's objection it was allowed to reopen to present newly discovered evidence. Olson stated that it could not properly go forward with its defense until the Board had produced the documents called for by the subpoenas. The Board has produced direct evidence on the charge of the unilateral wage increases and the two charges of surveillance. On its fourth charge of Olson's lack of good faith, it is relying on the inferences from all the evidence in support of the other three charges and all the circumstances of the case, plus evidence that Olson had no discussions with TWUA as to the un-

ion's majority status prior to the withdrawal of recognition.

In his certification the Master granted *limited* discovery to Olson. Of the four charges made by the Board, the Master "deems it relevant" to Olson's defense against the charge of withdrawal of recognition and refusal to bargain that the three files in question "be examined to determine whether such files contain admissible evidence or sources of admissible evidence" bearing upon these issues. Such examination by Olson of relevant documents, if any exist, is "necessary * * * in order for it to prepare its defense to the quoted charge." The Master expressly found that discovery was not necessary as to the other three charges—unilateral wage increases and company surveillance. As to these three charges, the Master said:

"The Board has adduced evidence on the other specifications of contemptuous acts, both prior and subsequent to July 21, 1959, sufficient to permit the Company to meet such evidence with contradictory oral testimony or to specify precisely the documents or statements needed to prepare its defense. In this connection, the Board furnished statements of witnesses called by it when requested by counsel for the Company prior to counsel's cross examination of such witnesses."

The discovery the Master found necessary was not pretrial; it was ordered during the course of the hearing. Further, it was not merely for the purpose of impeachment, but it was designed broadly to aid Olson to "prepare its defense" to the one charge of contempt.

Rather than provide for the direct production that Olson requested, the Master determined that the proper procedure would be for the Board to submit to him the three files for his examination *in camera*. The Master would then make available to Olson only such documents that bore upon the issue of Olson's good faith withdrawal of recognition and refusal to bargain.

The many varied arguments in this case advanced by Olson and the Board can be distilled into these five central issues:

(1) Does the court in contempt proceedings possess discovery power and can such power be referred to its Master?

(2) Assuming such power to subpoena for discovery any "relevant and material" documents, could the investigatory files in question possibly contain documents of that character?

(3) Assuming that such documents exist and are relevant, does some "executive privilege" preclude discovery in this contempt proceeding?

(4) Again, assuming the existence of relevant documents in Board files, does the "work product" doctrine preclude discovery?

(5) Assuming that some sort of discovery can be ordered, is the "Jencks" method adopted by the Master a proper one to safeguard the interests of all parties?

 The present case stands for the proposition that the court has the power in a contempt proceeding to order production of documents for discovery. The Board itself attached to its contempt petition a motion for discovery of documents in Olson's possession. Our order of October 24, 1960 granted such motion, and our order of reference stated that the Master may make "such orders and issue such subpoenas ad testificandum and duces tecum as reasonably relate to the discovery, inspection and deposition authorized by the Court * * *." In a number of other cases similar discovery power has been noted. In National Labor Relations Board v. Deena Artware, Inc., 1960, 361 U.S. 398, 404, 80 S.Ct. 441, 4 L.Ed.2d 400, discovery was allowed, although there was no square holding on its use. In a hearing of con-

tempt before the full bench of the Court of Appeals for the First Circuit, it was held that the court had the power under the All-Writs statute, 28 U.S.C.A. § 1651, to compel discovery. Bethlehem Shipbuilding Corp. v. National Labor Relations Board, 1 Cir., 1941, 120 F.2d 126. In National Labor Relations Board v. Parsons Punch Corporation, 6 Cir., 1957, 249 F.2d 956, a discovery order is set out. Since the court of appeals possesses the power to compel discovery, it may delegate such power to its agent, the Special Master, for the purpose of fact-finding. It has done so here in the order of reference by granting the Master the power to "require production before him of admissible evidence upon all matters relevant and material to the issues." With such power in the Master, there is no basis for the Board's argument that Olson's request is untimely, that it must be made directly to our court, or that the Master, by ordering a "Jencks" discovery, is constituting himself an agent "on behalf of the Company" for "belated and unrestricted discovery of the Board's files."

 The Board has stated that on no view or assumption most favorable to Olson will relevant evidence be revealed by an examination of the Board's three files in question. The Board properly argues that it has presented its case and now it is for Olson to rebut with evidence that it had a good faith doubt of the union's majority status. It is true that this evidence will largely come from Olson's own hands. But this is not to say that it is inconceivable, as the Board argues, that there might be contained in these three files certain evidence bearing on Olson's good faith. The investigations were conducted prior and subsequent to the alleged refusal to bargain. Further, much of the force of the Board's relevancy argument is dissipated when it admits that a certain document in the decertification file, 13–RD–407, is relevant to the issue of Olson's good faith.[1]

1. Cf., Starr v. Commissioner of Internal Revenue, 7 Cir., 1955, 226 F.2d 721, where our court did not reach the issue of the court's power to compel testimony of a revenue agent where it "is apparent * * * that [evidence sought to be dis-

The Board is willing to produce such document but stoutly maintains that it is the sole relevant evidence.

The Board in its brief has listed an inventory of the documents in each of its three files. But we have no precise knowledge of what is contained in the Board's files and can exercise no judgment as to the relevance of such documents. The short answer to the relevancy argument is to allow the Master to examine the files. If they are as barren of helpful, relevant evidence as the Board contends, then the Board is not injured; for the Master will turn over nothing to Olson. If, however, the files do contain relevant material, then such evidence should be produced.

■ The Board contends "it is clear" that the sole reason that Olson wants inspection is to find evidence to show an abuse of administrative discretion by the Board since it first dismissed the unfair practice charges on October 23, 1959 and then reinstated them on January 7, 1960. Having thus assigned to Olson an indefensible rationale for the production of the documents, the Board then persuasively shows that the mental processes and preliminary decisions of the members and staff of the Board are not at issue before the Master. We agree. But the Master ordered production for examination on an entirely different issue—that of Olson's good faith doubt of the union's majority status.[2] This is, of course, directly relevant to the Board's charge of refusal to bargain and withdrawal of recognition.

■ The Board before the Master and here relies on certain internal administrative regulations to preclude production of the files in question. Under Section 102.117(b) of the Board's Rules and Regulations, 29 U.S.C.A.App., the Board has found confidential and not available to public inspection all evidence collected by the Board (with certain exceptions irrelevant here) and all files, documents, reports, memoranda and records pertaining to the Board's internal management or to the investigative stage of proceedings. Production of these documents by a Board employee is authorized only upon permission of the general counsel of the Board, Section 102.118; and in the instant case, the general counsel has withheld the requisite consent. Cf., United States ex rel. Touhy v. Ragen, 1951, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 and National Labor Relations Board v. General Armature & Mfg. Co., 3 Cir., 1951, 192 F.2d 316, 317, where requests for production of documents were not made to the persons authorized by regulation to release them. "Hence," the Board stated, "if valid, it cannot be disputed that Section 102.118 of the Rules and Regulations governs this case and excuses Regional Director Madden from producing the documents."

We have had occasion recently to examine the effect of these rules as they relate to practice before the Board itself. In National Labor Relations Board v. Vapor Blast Manufacturing Company, 7 Cir., 1961, 287 F.2d 402, we held that such rules were not on their face a deprivation of the procedural due process constitutionally afforded a party appearing before the Board. We indicated that it is in the first instance for the Board to fashion its own rules of practice. Nevertheless, we reserved the right to review the administration of such rules if in a certain case a party made such a sufficient showing of "need" for pretrial production of documents that a denial thereof would constitute an abuse of discretion in a Board proceeding.

covered] was neither relevant nor material to the issues in this case." 226 F.2d at page 724.

2. The Master stated in colloquy with counsel:
"After the dismissal [of the unfair practice charges on October 23, 1959], it would seem that the Company may

have felt more justified in saying that in good faith it refused to bargain, whereas later on after the complaint was reinstated, so-to-speak, then the Company's position to claim that it refused to bargain in good faith is materially altered. And this is one of the important charges, as I see it, in your Petition."

In this case we are not concerned with the Board administering its own rules in internal agency proceedings and hearings. Here, the Board has come to a separate judicial forum to ask this court to find Olson in contempt of our earlier decree. The function of determining and assessing the facts is now before this court and no longer within the province of the administrative agency. Given the specific request made by Olson, the determination of the Master that the production of any relevant document is essential to a fair determination of this case, the finding of a possibility of surprise, prejudice and disadvantage to Olson if production is precluded, the total absence of any showing of specific harm to the Board, and finally the limited method of production, it follows that the Board's rule suppressing its documents cannot limit the power of this court to make an unfettered determination of the facts.

■■ The obvious function of a trier of fact is to gather evidence relevant to the issues of fact, weigh conflicting evidence, and make a judgment as to what the facts are. The claim of privilege impedes the investigation, gathering and weighing of information and thereby restricts the trier of fact in making a fully informed judgment. Therefore, a privilege should never be lightly invoked. Each privilege (and each resulting limitation of the fact-finding process) must be justified by some important countervailing policy. The privilege against naming an informer is justified to insure a steady stream of confidential information to the government. Roviaro v. United States, 1957, 353 U.S. 53, 59–60, 77 S.Ct. 623, 1 L.Ed.2d 639. The common law lawyer-client privilege serves an obvious purpose. Information relating to national defense and security may be withheld from disclosure on the grounds of executive privilege. United States v. Reynolds, 1953, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727. But in each instance where the court is the trier of fact, it must balance the need for production of the "privileged" documents against the reasons for suppressing such documents. Roviaro v. United States, 353 U.S. at page 62, 77 S.Ct. at page 628; Mitchell v. Bass, 8 Cir., 1958, 252 F.2d 513, 517.

In considering the reasons for and against production, the Master has properly struck a balance between the needs of Olson for relevant objective evidence of its good faith and the policy of confidentiality of government files. A consideration and weighing of these factors is consistent with the approach of Mr. Justice Reed in Kaiser Aluminum & Chemical Corp. v. United States, 1958, 157 F.Supp. 939, 141 Ct.Cl. 38. In that case, Kaiser attempted to discover internal General Service Administration reports, memoranda and other documents relating to sales of certain factories to Kaiser and a competitor. The call was complied with except for one document that was confined to recommendations and advice on program policy. As to that document, the Court found an "executive privilege" justifying a refusal to answer Kaiser's call. "There is a public policy involved in this claim of privilege for this advisory opinion—the policy of open, frank discussion between subordinate and chief concerning administrative action." Id., 157 F.Supp. at page 946. But even such privilege as to advisory opinions is conditional. "It is necessary therefore to consider the circumstances around the demand for this document in order to determine whether or not its production is injurious to the consultative functions of government that the privilege of non-disclosure protects." Ibid. Since this document was solely a policy recommendation and did not bear on the operative factual background of the case, which information was available to Kaiser from other sources, and since Kaiser was unable to suggest any other need for producing the policy document, discovery was denied.

■ However, in the case before us, since the Board has indicated there is at least one document possibly relevant to Olson's good faith, there may be others

bearing on this factual issue of Olson's defense. There is no claim by the Board that all remaining documents are exclusively policy recommendations. Further, from the posture of the case before him, the Master has determined that there is a need for discovery to preclude prejudice and unfairness. In such circumstances, where "good cause" exists, an agency regulation or a conditional executive privilege cannot stand in the way of necessary discovery.

A "need" likewise must be shown for discovery of the "work product" of an attorney. Hickman v. Taylor, 1947, 329 U.S. 495, 67 S.Ct. 385, 91 L. Ed. 451 rejected a discoveror's request for work product as a matter of "right" under the Federal Rules of Civil Procedure, 28 U.S.C.A. This restriction existed apart from the limitation on discovery because of an attorney-client relationship. In order to force disclosure of work product—interviews of witnesses, intraoffice memoranda, résumés of strategy—a discoveror must make a showing of "good cause."

Some of the documents contained in the files here might technically be considered "work product." Others may be documents traditionally subject to discovery. But in either event, the balance in this case has properly been struck in favor of discovery. This is so for the same reasons that we outlined in our rejection of the Board's contention that executive privilege absolutely precluded discovery.

Finally, there is no error in the method the Master proposes to effect discovery. The three files in question will be "submitted to the Master to allow the Master to determine which matters, if any, in such files relate 'to any issue in the Company's defense', in much the same manner as statements or reports made by a government witness or prospective witness are examined by the Court pursuant to subparagraph (c) of Section 3500 of Title 18, U.S.C.A." The Master will "determine whether such files contain admissible evidence or sources of admissible evidence bearing upon the issue whether the Company withdrew recognition and refused to bargain further with the Union in the absence of good faith doubt as to the Union's majority status." Olson has agreed to abide by the Master's judgment in his selection of the relevant documents. This procedure will insure the integrity of the Board's files as to non-relevant material, but will allow for production of relevant documents. The possibility of unconscious prejudice of the Master, as the Board suggests, because of his examination of the files would be no greater than that in the procedure Congress itself has established in the Jencks Act.

Our holding in this review is expressly limited in its application to contempt proceedings of the character now before us.

For the foregoing reasons it is ordered that the Board's motion to reverse in part the ruling of the Special Master be and the same is hereby denied. This cause is now remanded to the Special Master for further proceedings consistent with the views herein expressed.